## No. 11,180.

### THE STATE OF LOUISIANA VS. D. S. GASTER.

1. In Louisiana all crimes are statutory, and the determination and definition of the acts which are punishable as crimes are purely legislative functions which can not be delegated to or exercised by the judiciary without violating Arts. 14 and 15 of the Constitution.

2. Section 869 of the Revised Statutes, which denounces and punishes as a crime any civil officer guilty of "any misdemeanor in the execution of his office," does not, on its face, define what acts shall constitute such misdemeanors, and unless there is some other law which defines them, it remits the definition thereof to judicial discretion, which is unconstitutional.

3. The 33d section of the Act of 1805 authorized a reference to the common law of England for the definition of the particular crimes therein enumerated; but neither that nor any law of the State has authorized reference to that system in order to ascertain the definition of any other crime not therein enumerated.

4. The omission in Sec. 976, of the Revised Statutes (which otherwise reproduces the 33d section of 1805), of the words "hereinbefore named" was not intended to extend or alter the meaning thereof so as to embrace all crimes and misdemeanors, however obscure or obsolete, known to the common law of England. The omission of those words without embodying an equivalent restriction was only a careless oversight, which was fortunately made clear by the final Sec. 3990, in which the 33d section of the Act of 1805 was expressly reserved from repeal, showing, beyond controversy, the legislative intent to maintain the law just as it was established by that section and had thereafter remained.

5. Held, therefore, that Sec. 869, Revised Statutes, which punishes "misdemeanors in office," without defining it or referring to any other law defining it, imposes on the judiciary the legislative duty of declaring what acts constitute the crime denounced, and thus violates Arts. 14 and 15 of the Constitution.

6. Whether logically or illogically, the judicial exposition of the 33d section of the Act of 1805 is to the effect that the *first* clause of the section only adopted the common law *definitions* of the particular crimes named in the act; while the *second* clause, relating to forms of indictment, method of trial, rules of evidence and proceedings, has been held to apply to crimes and offences generally. Our original opinion has simply followed this jurisprudence on the first point and has not disturbed it on the second.

7. The 33d section of the Act of 1805 was held not to be within the constitutional prohibition against the adoption of any foreign system or code of laws by reference, on the express grounds that this act was passed prior to the adoption of our constitutions, and that this provision should not be given a retrospective operation. If the contention of the State, that the Act of 1855 and Sec. 976, Revised Statutes, are new statutes extending the adoption of the common law beyond the 33d section and making it applicable to all crimes, were well founded, very grave questions would arise as to their validity under the Constitution.

8. No technical rules of precision in the definition of acts punished as crimes have been laid down. When the language used in the statute sufficiently and clearly indicates the legislative meaning and intent, these will be given liberal effect. But language of such wide and indefinite import as to leave absolutely uncertain what acts are within and what without the statutory prohibition can not operate as a valid criminal statute.

APPEAL from the Criminal District Court for the Parish of Orleans. *Moise, J.*

*Lionel Adams*, Assistant District Attorney, and *M. J. Cunningham*, Attorney General, for the State, Appellee.

*E. A. O'Sullivan* for Defendant and Appellant.

The opinion of the court was delivered by

FENNER, J. The information charges that on a certain Sunday one Emile Bauman kept his bar-room open and conducted his business in violation of the act of the General Assembly known as the Sunday law; " and that one D. S. Gaster, late of the parish of Orleans, with force and arms, in the parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the parish of Orleans, being then and there a civil officer, to-wit, a member of the police force of the city of New Orleans, and required by his office and by law, with or without warrant, to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offences, did then and there have personal knowledge, by

actual view, of the commission by the said Emile Bauman of the said before described offence in manner and form as hereinbefore set out and alleged, but did then and there unlawfully neglect and refuse to arrest the said Emile Bauman, as he, the said D. S. Gaster, ought by virtue of his office, and as by law he was in duty bound, to have done; contrary to the form of the statute of the State of Louisiana in such case made and provided, and against the peace and dignity of the same."

The prosecution is based on Sec. 869 of the Revised Statutes.

" SEC. 869. If any judge, justice of the peace, sheriff or any other civil officer shall be guilty of any misdemeanor in the execution of either of their respective offices, he shall on conviction suffer fine or imprisonment, or both, at the discretion of the court."

The defendant made a motion to quash the information on the following grounds:

"1. That he is not a civil officer as alleged in the said information herein filed.

"2. That, as charged, he is a member of the police force of the city of New Orleans, appointed under the law by the Police Board of said city, not holding any commission from the State Executive, and not elected by the people.

"3. That this prosecution is not based on any statute of the State of Louisiana.

"4. That if said information is based on Sec. 869 of the Revised Statutes, then and in that case, said statute is null and void and contrary to the Constitution of the State of Louisiana, in this, that the said statute neither specifies or defines any crime known to the laws of the State.

"That in no part of the statutes of Louisiana, or elsewhere, is misdemeanor defined; that though misdemeanor may be a crime, it simply designates a class of crimes, varying according to statute, and depending on the penalty inflicted."

The motion to quash was overruled, to which defendant reserved his bill of exceptions.

The defendant, having waived trial by jury and elected to be tried by the court, was, on the 13th of January, 1893, tried in due form, the facts in the case having been admitted without proof. The court, considering the law and the evidence, returned a verdict of "guilty."

Amongst the admissions of fact we find the following, in substance:

That in failing to arrest Bauman without a warrant defendant acted under orders of the mayor of New Orleans. That " it was not the intention of defendant to violate the law, but that he was carrying out, as he thought lawfully, the orders of his superior officers." That in accordance with previous instructions received he promptly reported Emile Bauman to the district attorney's office as a violator of the Sunday law, with names of witnesses,. and that the district attorney entered a prosecution against said Bauman for the offence referred to, which is still pending undetermined before the court.

The most important question in the case—and it is one of transcendent importance—is whether the Sec. 869 of the Revised Statutes is a valid statute.

It would hardly be claimed that a statute denouncing a crime and imposing penalties therefor without, in any manner, defining the nature of the offence, or of the acts which constitute it, would be consistent with either the letter or the spirit of the Constitution. Article 8 of our Constitution requires that " in all criminal prosecutions the accused shall enjoy the right to be informed of the nature and cause of the accusation." It is but a self-evident extension of the same principle that, before being subjected to criminal penalties for his acts, the citizen should be clearly informed by the law that such acts are denounced by the law as crimes.

Moreover, Articles 14 and 15 of the Constitution divide the powers of government between three departments—executive, legislative and judicial, and provide that ,"no one of these departments shall exercise power properly belonging to one of the others."

All crimes in Louisiana are statutory, and there can be no crime which is not defined and denounced by statute. The determination and definition of acts which are punishable as crimes are purely legislative functions, which can not be delegated to or exercised by the judiciary.

The statute denounces as a crime on the part of civil officers, " any misdemeanor in the execution of their respective offices." It does not, on its face, undertake to define, in any manner, what acts are misdemeanors in office, and unless there is some other law which furnishes such definition, there is no other source to which we may look for it except to the discretion of the judiciary, which, in each case brought before it, will be vested with determining whether or not the particular acts charged, ranging from the most trivial to the

most serious derelictions, from the most malicious infractions of duty to the most innocent errors of judgment, shall or shall not be punished as crime. This would operate a delegation to the judiciary of powers purely legislative, in flagrant violation of the constitutional prohibition.

We are far from attributing to the learned counsel of the State any denial of these self-evident principles. He would be prompt to concede them. But his contention is that there is a law of the State which does define the term "misdemeanor in the execution of an office," and the acts which constitute it, and he refers to the following section of the Revised Statutes:

" SEC. 976. All crimes, offences and misdemeanors shall be taken, intended and construed according to and in conformity with the common law of England; and the forms of indictment (divested, however, of unnecessary prolixity), the method of trial, rules of evidence, and all other proceedings whatsoever, in the prosecution of crimes, offences and misdemeanors, changing what ought to be changed, shall be according to the common law, unless otherwise provided."

And he contends that, as to this crime, the law refers us to the common law of England, where the acts constituting it are explicitly defined.

This section is the reproduction of the 33d section of the Act of 1805, with the simple omission of the words " hereinbefore named " after the words "crimes, offences and misdemeanors."

That act, which is the foundation of our penal system, fully defined as well as punished numerous offences, but in the case of many familiar crimes, such as murder, rape, arson, robbery, burglary, forgery and the like, it simply described them by name without further definition, and in this 33d section it supplied this deficiency by providing that the crimes, etc., " hereinbefore named" shall be " taken, intended and construed according to the common law of England," meaning thereby to adopt the definition of the acts constituting those particular crimes which prevailed in the English law of that date.

It is a significant fact that by a subsequent act of the same year, supplementary to the above, the same provision was extended to "all other crimes, offences and misdemeanors." See Sec. 3 of Act of July 3, 1805.

But, evidently appreciating the consequences of such an extension, in the following year this latter section was repealed. See Act. of May 2, 1806.

This left the 33d section of the original act of 1805 alone in force, and confined the legislative adoption of the common law definitions of crimes to the particular crimes therein enumerated. State vs. Smith, 30 An. 845.

When that great jurist, Edward Livingston, was appointed by the Legislature to prepare a criminal code for this State, in presenting the same to the General Assembly he accompanied it with an elaborate report in which he reviewed the defects of the existing system, and expounded the philosophy of the reform proposed. No feature of the old system was more severely criticised than the 33d section of the Act. of 1805, and while clearly showing that it applied only to the particular crimes designated in that act, he denounced it, even as thus confined, as wrong in principle and unjust in operation, because instead of advising the citizen plainly and unequivocally of the nature of the particular acts denounced and·punished, it referred him for their ascertainment to a complicated system of foreign law, with which he was unfamiliar, and whose provisions were to him a mystery.

Thus he says: "Theft, burglary, murder and other crimes are made punishable. But if we want to know what theft, murder or any other crime on that list is; if we wish to know what means we may use to prevent either of those crimes; how the offender is to be arrested, how confined, how bailed, how tried; what evidence can be admitted; what is required for conviction—for all these and for a. hundred other questions equally important, we are referred to the Common Law of England; that is to say, what one of its greatest panegyrists styles 'the *unwritten* or common law,' consisting of 'general customs' and of certain particular laws which, by custom, are adopted and used by certain particular courts'—the whole resting, as we see, on custom; and when we come to inquire how these customs are to be known, the same author gives the answer, 'by the judges,' who, he says, are the 'depositaries of the laws, the living oracles, who must decide in all cases of doubt,'" etc. We need not quote further from this fierce arraignment of this statute. Livingston's. Code, p. 7 *et seq.*

Mr. Livingston's code was not adopted, and the 33d section, as confined to the particular crimes therein enumerated, remained the law of the State, and, it must be said, has not produced the evil effects contemplated by its gloomy vaticinations.

But when it is claimed that the Sec. 976 of the Revised Statutes, by simply omitting the words " hereinbefore named," has extended the provisions of the 33d section so as to cover every crime or misdemeanor known to the common law of England, however obscure and even obsolete, and thus to authorize the Legislature to denounce any such crime by simply naming it, without definition of the acts constituting it, we encounter a contention of such gravity that it demands most serious consideration.

It would be difficult to believe that the compilers of our Revised Statutes, or the Legislature, in adopting them, ever contemplated so serious a change in our law. The insertion of Sec. 976 was, without doubt, intended as a mere reproduction of the 33d section of the act of 1805, and the omission of the words " hereinbefore named," without embodying any equivalent restriction, was a mere act of carelessness, without reflection on the serious consequences, now claimed as resulting therefrom. Fortunately the Revised Statutes themselves furnish such conclusive proof in support of this interpretation that we are relieved of all difficulty in applying it. This is found in the final Sec. 3990 of the Revised Statutes, as follows: " That all laws or parts of laws contrary to or in conflict with the provisions of this act, and all laws or parts of laws on the same subject matter, except what is contained in the Revised Civil Code of Practice, be and the same are hereby repealed, *except the thirty-third section of an act entitled ' An act for the punishment of crimes and misdemeanors,' approved May 4, 1805,*" etc.

This significant exception demonstrates so conclusively the solicitous purpose of the Legislature to maintain our law on this particular subject just as it was established by that 33d section that we think it admits of no serious controversy.

We therefore conclude that, so far as definitious of crimes are concerned, the authority for reference to the English law conferred by the 33d section remains, as it has always been, confined to the particular crimes enumerated in the act of 1805. State vs. Smith, 30 An. 846.

The crime of "misdemeanor in the execution of an office" is not, directly or indirectly, referred to in the act of 1805, and, therefore,

State vs. Gaster.

so far as its definition is concerned, we do not find it in the statute, and are referred to no law or body of laws where such definition may be found. Who, then, is to determine what particular acts constituted a criminal "misdemeanor in the execution of an office?" We can discover no authority to which we may look except to the judges, who are left at liberty to select such guides as they choose, and decide according to their discretion.

It chances that this particular statute attracted the special attention of Mr. Livingston, and his remarks upon it elucidate the position so aptly that we reproduce them:

"By the act of June 7, 1806, any judge, justice of the peace, sheriff or other civil officer who shall be guilty of any misdemeanor in the execution of their respective offices, shall suffer fine and imprisonment or both, etc. Now, without repeating the argument formerly used, that the reference to the law of England does not extend to offences under this law, let us ask, what is a misdemeanor? Christian, in his notes to Blackstone, says: ' In the English law, misdemeanor is generally used in contradistinction to felony, and misdemeanors comprehend all indictable offences which do not amount to felony.' But, by our law, there can be no indictable offence but those created by statute; but every statute that has created an offence with us has also prescribed the punishment. What, therefore, has this law to operate upon? Nothing, if it relate only to offences that were indictable before; but if it mean something else, and is intended to create a new offence, that offence ought to have been defined, or else the court have not only the judicial task of apportioning within the prescribed limits what shall be the punishment, but also the legislative duty of declaring what acts shall be misdemeanors. We have not even the resource of a reference to the English law, for the statute which creates the offence was passed since the year 1805, and contains no reference to that law; and if we had, the matter would not much be mended, as we have seen in former parts of this report. When a word is use in legislation that is neither technical nor explained in the law, it must, of course, be understood according to the signification it has in common parlance; but there can be no technical meaning affixed to this word, because there is no body of laws to which we are or can be referred for its explanation. We have no common law, and the statute refers to none, therefore it must have the same meaning here that it would in common conversation. What

is that? Both etymology and usage give the answer; any misconduct whatever. A misdemeanor in office, then, is any demeanor that is contrary to official duty. Our present law, therefore, is infinitely more strict than that which is offered as a substitute; without defining any particular misconduct by a sweeping clause, it makes the minutest inattention punishable by fine, imprisonment, loss of office, and incapacity ever to hold one."

We are bound to hold that the statute which punishes "misdemeanor in office" without defining it, and imposes on judges, as Mr. Livingston says, "not only the judicial task of apportioning what shall be the punishment, but also the legislative duty of declaring what acts shall be misdemeanors," violates the Constitution of the State, and can, therefore, furnish no foundation for this prosecution.

The statute seems always to have been treated as a dead letter, for, so far as we are aware, no prosecution under it has ever before been instituted, and but for the erroneous supposition that Sec. 976 of the Revised Statutes had vitalized it by authorizing a reference to the common law for its definition, it is probable the learned district attorney would not have resurrected it.

The above question was so overshadowed in importance and so completely decides the case that we need not determine other doubtful questions which would have required decision if a different conclusion had been reached. But we may suggest at least two other serious difficulties which the State would have encountered, viz.:

1. Whether the term "misdemeanor in the execution of an office" describes any particular crime known to the common law of England. That law denounced acts of malfeasance and nonfeasance in office as indictable offences and assigned them to the class of crimes known as misdemeanors, though, perhaps, some of such acts may, for aught we know, have been felonies. But the crime was the *malfeasance* or *nonfeasance*, or *misconduct*, and the term *misdemeanor* only designated the class of crimes to which they belonged.

2. Whether, under the admissions in the case, the act charged, when done by a subordinate in obedience to the orders of his superior officer, would have been an indictable offence at common law, and whether the principle that the command of a superior is no defence for committing a crime, would apply to mere acts of official administration such as are here involved.

State vs. Gaster.

But it is unnecessary to enter on these questions.

It is, therefore, adjudged and decreed that the judgment and sentence appealed from be annulled and reversed; that the motion to quash the information filed herein be sustained and the defendant discharged.

## ON APPLICATION FOR REHEARING.

FENNER, J.   The suggestion that the original opinion herein rules, in any manner, as to the effect to be given to the second clause of Sec. 976 of the Revised Statutes and of the 33d section of the Act of 1805 relating to " the forms of indictment, the method of trial, the rules of evidence, and other proceedings," etc., in criminal prosecutions, and declaring that they " shall be according to the common law, unless otherwise provided," is entirely unfounded.

It must be conceded that the jurisprudence of the State has always extended the provisions of this second clause to other crimes besides those named in the Act of 1805, and however illogical it may be (in view of the word "said" in the 33d section), we have no disposition to change a rule so deeply interwoven into our criminal system. But with reference to the first clause of the 33d section, the jurisprudence is precisely opposite.   In the case of State vs. Smith, 30 An. 846, this court distinctly held as follows: " The general criminal statute enacted in 1805 did not adopt, as a portion of our law, all the crimes and misdemeanors known to the common law at that date.   It merely adopted the common law *definitions of those offences declared to be crimes by that act*, and incorporated, as a part of our system, the common law mode of prosecution as to forms of indictment, method of trial, rules of evidence and all other common law proceedings in criminal cases."

The same ruling was repeated in State vs. Depass, 31 An. 487. We take the foregoing to be a correct statement of the judicial exposition of the meaning and effect of the 33d section of the Act of 1805, and we have simply adhered to it.

Our conviction remains unaltered and very decided that neither the act of 1805, nor Sec. 976 of the Revised Statutes made or intended any change in the law of the State as thus established under the 33d section of the act of 1805, as to which it does seem to us that the care taken in both acts expressly to reserve that section from repeal removes all possible doubt.   Indeed, were it

otherwise, and should it be held that these later statutes were de-signed to go beyound the act of 1805 and to extend the adoption of the common law system as applicable to all criminal offences, grave doubts would arise as to their constitutionality under Art. 31 of our present Constitution: "The General Assembly shall never adopt any system or code of laws by general reference to such system or code of laws, but in all cases shall recite at length the several provisions of the laws it may enact."

This provision has been embodied in all our Constitutions.

The 33d section of the Act of 1805 was held to be exempt from the operation of this prohibition only because it was adopted prior to the first Constitution of 1812, and because this court declined to give a retrospective operation to this constitutional provision.   State vs. Lacombe, 12 An. 195.

This accounts for the wise solicitude of the Legislature, in the later statutes referred to, to keep the 33d section in force and to preserve it from repeal, and warns us against the attempt now made to con-vert these later acts into new and different statutes which would have no claim to exemption from submission to the constitutional test.

In conclusion, we may say that we have not laid down any tech-nical rules of precision in the definition of the acts constituting penal offences.   When the language used in criminal statutes has any clear and definite meaning indicating the particular kind of acts which are made punishable, we should give liberal effect to the legislative intent.   But when, as in this case, the language employed is of such vague and indefinite import that it might embrace many acts which could not possibly have any criminal character, and leaves the dis-crimination between these and others to arbitrary judicial discretion, we are bound to hold the statute to be violative of constitutional rules referred to in our original opinion.

Rehearing refused.