PROYOSTY, J.
A few days before the day fixed for the recent Democratic primary election, question arose as to whether a voter who could read his ballot, and was not physically unable to mark it, had the right to have a person go into the polling booth with him to aid him in the preparation of his ballot. An opinion which had been given by the Attorney General to the chairman of the Democratic State Central Committee had been understood to be in affirmance of such right, and the district attorney for the parish of Orleans had given expression to a contrary opinion, and the Governor had considered the point to be of sufficient public importance for him to issue a proclamation indorsing what he understood to be the view of the Attorney General. The Attorney General had then announced that his said opinion had been misunderstood; and that he, on the contrary, concurred in the view taken by the district attorney for the parish of Orleans.
In voting at said election, the accused in the present case, though able to read, and not afflicted with any physical disability, called for assistance in the preparation of his ballot; and an information was filed against him for the violation of the Primary Election Law (Act 49 of 1906).
The information alleges that he “did falsely state that he was unable to mark and prepare his ballot.”
He demurred to the information, and also moved to quash it, on the ground that there was no law which made it a crime for a voter at a primary election to call for assistance in the preparation of his ballot, who, though able to read and not physically disabled, yet from some other cause was unable to prepare his ballot.
[1] On the trial it developed that the accused had made no statement at all, but had simply asked one of the watchers to assist him in preparing his ballot, and that the assistance had consisted in the giving of information with regard to which ones of the candidates on the ticket were in sympathy with his own factional affiliation, and that so far as the physical act of marking his ballot was concerned he had done that himself.
This being the condition of the evidence, his counsel moved the judge, who was trying the case without a jury, to discharge him, for the reason that, in the first place, he had not made any statement at all; and, in the second place, if he had made any, it had not been of inability to mark his ballot, but of inability to prepare his ballot, in the sense of whom to vote for, and that no statute makes the latter statement criminal.
The learned trial judge denied these motions, for reasons which in no wise dispute the facts above stated, but involve simply *907 and purely the -proper Interpretation of the said Act 49 of 1906 — the Primary Election Law.
The principal purposes for which the constitutional convention that formed the Constitution of 1898 was called were to provide for the reorganization of the electorate of the state, and to provide the means of securing honesty and fairness in elections. As to the former, the object being to eliminate the undesirable, ignorant colored voter without at the same time eliminating the unlettered, but none the less desirable, white voter. This was accomplished by excluding from the suffrage all unregistered voters, and by allowing none to register who could not qualify either under the so-called grandfather clause of the Constitution, or under the clause providing for educational and property qualifications. Honesty and fairness in elections was secured by the adoption of the so-called Australian ballot system, by which the voter is required to prepare his ballot in secrecy; and the Legislature was directed to make provision for that manner of voting. It being fully realized, however, that under this new rSgime the situation, for a time at least, would be that nomination by the Democratic party would be equivalent to election, and that, therefore, the primary election held for the nomination of the candidates would be the real election, and the election under the general election would be practically nothing more than a mere formal confirmation of the result of the primary election, it was deemed necessary to regulate also the primary elections. But here an insurmountable difficulty presented itself in connection with the secrecy of the ballot. How could voters prepare their ballots in secret when they could not read and write. This difficulty had been met in so far as the general election was concerned by requiring the political parties to adopt party emblems to be printed on the ticket opposite the names of the nominees of the party to indicate to the unlettered voter who were the nominees of his party, and enable him to vote by simply stamping this emblem. The Democrat would stamp the rooster, and the Republican the elephant. But this device would be of no avail for party nominations, because the several candidates would have to be voted for and might be very numerous, and, unless the voter could read the names on his ticket, he could not possibly prepare it. Not knowing how to get over this difficulty, the constitutional convention had to content itself with a general direction to the Legislature to adopt the best means possible to secure fairness in primary elections. This it did by article 215, providing that:
“The Legislature shall enact laws to secure fairness in party primary elections, conventions, or other methods of naming party candidates.”
The Legislature promptly, at its first session after the adoption of the Constitution of 1898, carried out the constitutional behest to “provide some plan by which voters may prepare their ballots in secrecy at the polls” by passing Act 152, page 266, of that year, known as the “General Election Law.” This law enables the uneducated voter to prepare his ballot by simply stamping the party emblem.
Nothing was done in the matter of a primary election law until the session of 1904, when a joint primary election committee was appointed by the House and Senate for the purpose of drafting a primary election law. The report of this committee was presented at the session of 1906, and is embodied in Act 49, p. 66, of that year.
This act was copied verbatim from the General Election Law (Act 152 of 1898) in most of its provisions; but on the crucial point of the preparation of the ballot in secrecy it had to and did make a wide de *909 parture from it. For comparison of the two provisions we give them side by side.
General Election Law Primary Election Law
(Act 152 of 1898). “Sec. 76. Be it further enacted, etc. * * * Any voter who declares to the presiding commissioner that by blindness or other physical disability he is unable to mark his ballot, shall, upon request, receive the assistance of two of the commissioners, who shall be of different political parties, or factions, represented among the commissioners, in the marking thereof, and neither the voter nor the said commissioners shall thereafter give any information regarding the same. The commissioner shall require such declaration of disability to be made by the voter under oath to him, and he is hereby qualified to administer same.”
(Act 49 of 1906). “Sec. 24. Be it further enacted, etc., * * * The voter shall be at liberty, if he is unable to prepare his own ballot, to call upon one of the commissioners, or watchers, or clerks of election to assist him.”
It will be noted that the one statute requires an express declaration of inability to prepare the ballot to be made, and to be made under oath, and that no other cause of inability is recognized than the physical disability to mark the ballot; whereas, the requirement that an express declaration be made of inability to prepare the ballot is omitted from the other statute, and the inability to prepare the ballot is not restricted to physical disability, but is extended to disability from any cause, the language being general, to wit, “if he is unable to prepare his ballot’’; i. e., from any cause.
The General Election Law had restricted the inability to physical inability to “mark” the ballot, because nothing but physical disability could prevent a voter from recognizing the party emblem on the ticket and stamping it. But, when it came to selecting from a long list of names appearing on the ticket, the situation was entirely different. Hence, instead of restricting the inability to physical inability to “mark” the ballot, the committee extended it to inability from any cause.
The voter, being thus left at liberty to call for assistance whenever he finds himself unable from any cause to prepare his ballot, cannot be convicted of crime if, finding himself unable to determine who in the list of candidates for the several offices are the candidates favored by the political party with which he is in sympathy, he calls for assistance.
The contention of the prosecution is that it is not possible for a voter who can read, and who is not physically disabled, to be unable to prepare his ballot, and that there; fore any voter who can read, and is not physically disabled, who calls for assistance, violates the provision of the Primary Election Law, § 24, which denounces a penalty for “any voter who shall make a false statement as to his inability to mark his ballot.”
This contention might be well founded if the statute restricted the inability to physical disability and the inability to read the ballot; but it does not. It extends it to inability from any cause. If interpreted as here contended, the statute would be made to say something which it does not expressly say, and does not even by necessary implication say. Gonduet would be made a crime which the statute does not expressly, or even by necessary implication, make a crime.
[2] To enlarge in this way a criminal statute would be to go counter to what is universally recognized to be the cardinal rule of interpretation for criminal statutes, namely, that they must be construed strictly. In the language of Chief Justice Marshall in U. S. v. Wiltberger, 5 Wheat. 95, 5 L. Ed. 37, quoted approvingly by this court in State v. Fontenot, 112 La. 642, 36 South. 635:
*911 “It would be dangerous indeed to carry the principle that a case which is within the reason or mischief of the statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity or of kindred character with those which are enumerated.”
On the same subject other courts and judges have expressed themselves, as follows:
“There can be no constructive offense, and before a man can be punished, his case must be plainly and unmistakably within the statute.” U. S. v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; U. S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37; In re McDonough (D. C.) 49 Fed. 360.
“Criminal statutes are inelastic, and cannot be made to embrace cases without the letter, though within the reason and policy, of the law.” State v. Lovell, 23 Iowa, 304.
“Doubts as to the interpretation of a statute must be resolved in favor of the accused.” State v. Bryant, 90 Mo. 534, 2 S. W. 836; People v. Reilly, 50 Mich. 384, 15 N. W. 520, 45 Am. Rep. 47; State v. Leo, 108 La. 496, 508, 32 South. 447; State v. Finch, 37 Minn. 433, 34 N. W. 904.
In State v. Peters, 37 La. Ann. 730, this court said:
“Criminal statutes cannot be extended to cases not included within the clear import of their language.”
In State v. King, 12 La. Ann. 594, Justice Cole, as the organ of the court, said:
“Nothing would be more dangerous to the liberties of the people than that courts should consider as the law not statutes in actual existence, but the motives of the Legislature. If such was the rule, there would then be no certainty in the administration of justice; different courts would vary as to the motives of the sovereign power; in one part of the state particular actions would be viewed and punished as crimes, and in other parts they would be justified.
“Judicial tribunals derive their power of condemnation from the Legislature, and have no more right to condemn - without authorization of law than any private individual. Personal rights would never be secure if courts were guided by a desire to punish and prevent crimes without regard to the law and the legal power.”
12 La. Ann. at page 595:
“We regret to be obliged to set the prisoner at liberty, but it is far wiser and safer for society and the rights of the citizen to allow him to be liberated than to violate a great principle in the interpretation of statutes | which has had the sanction of the most learned and enlightened members of the judiciary.”
In Simms v. Bean, 10 La. Ann. 346, Chief Justice Slidell said:
“The law is not prone to extend punishments and penalties, and this statute, highly severe in the consequences it inflicts, and penal in its character, should receive a strict judicial construction; that is to say, it should not be extended to derelictions of duty not specially and clearly described and comprehended in it.”
In State v. Leo, 108 La. 496-508, 32 South. 447, 451, Chief Justice Nicholls, as the organ of the court, interpreting section 833 of the Revised Statutes, said:
“The object of the General Assembly in enacting section 833 is very evident, but it does not suffice in a statute (particularly in a criminal statute) that its purpose should be manifest. To be effective, the purpose must find expression in the language of the law itself, as required by legal rules. We have held permissible sometimes to restrain the generality of the terms of a law so as to exclude from its operation exceptional cases, but we are not authorized to eke out or enlarge the 'terms of a limited law so as to place thereunder cases which evidently should have been included therein to fully effectuate their object, by which, by inadvertence or other cau'ses, were omitted.”
In Shaw v. Clark, 49 Mich. 384, 13 N. W. 786, 43 Am. Rep. 474, it was held that an act not expressly prohibited by the statute cannot be reached by the statute merely because it resembles the offenses provided against, or may be equally and in the same way demoralizing or injurious.
In England the same rule of construction of penal statutes prevails:
“We must not extend a penal law to other cases than those intended by the Legislature, even though we think they come within the mischief intended to be remedied.” Lord Kenyon in Jenkinson v. Thomas, 4 T. R. 665, 666.
“We are called to construe a penal enactment. Those who contend that the penalty may be inflicted must show that the words of the act distinctly enact that it shall be incurred under the present circumstances. They must fail, if the words are merely equally capable of a construction that would, and one that would not, inflict the penalty.” Dickenson v. Fletcher (1873) L. R. 9 C. P. 1, at page 7; 43 L. J. M. C. 25, at page 28, Brett, J.
“In construing an act like the present by *913 which a penalty is imposed, we must look strictly at the language in order to see whether the person against whom the penalty is sought to be enforced has committed an offense within the section.” Graff v. Evans (1882) 8 Q. B. D. 373; 51 L. J. M. C. 25, Field, J.
“But then comes the question whether the plaintiffs are also entitled to recover penalties under section 6 (25 & 26 Viet. c. 68). We must be very careful in construing that section because it imposes a penalty. If there is a reasonable interpretation which will avoid the penalty in any case, we must adopt that construction. If there are two reasonable constructions, we must give the more lenient one. That is the settled rule for the construction of penal statutes.” Tick & Sons v. Priester (1887) 19 Q. B. D. 629, at page 638; 56 L. J. Q. B. 553, Lord Esher, M. R.
“The well-settled rule that the court will not hold that a penalty has been incurred unless the language of the clause which is said to impose it is so clear that the case must necessarily be within it.” Id. at page 645, Lindley, L. J.
“It is a sound rule of construction that, when any penalty or disability is imposed by statute on any of her Majesty’s subjects, the court before any charge is preferred must be able to see clearly that the conduct is that which will render a person liable to the penalty so imposed.” Crane v. Lawerence (1890) 25 Q. B. D. 152, at page 154, 59 L. J. M. C. 110, at page 111, Cave, J.
“I have certainly; understood the rule to be that, where there is an enactment which may entail penal consequences, you ought not to do violence to its language in order to bring people within it, but ought rather to take care that no one is brought within it who is not brought within it in express language.” London County Council v. Aylesbury Dairy Co. (1898) 1 Q. B. 106, at page 26, Wright, J.
The act of the accused in this case could be brought within this criminal statute only by construction, and, as the foregoing excerpts indicate, conduct not expressly or unmistakably made criminal by statute cannot be made so by construction. Nothing is a crime which is not clearly and unmistakably made a crime.
In the present case the very fact itself of the division of opinion on the point would indicate sufficiently that the matter was very far from being clear or unmistakable.
Judgment set aside, and the accused ordered released without day.
See concurring opinion of LAND, J., 58 South. 766.