29 So.2d 758

**STATE v. TRUBY et al.**

No. 38372.

Feb. 10, 1947.

Dissenting Opinion March 5, 1947.

John R. Hunter & Son, of Alexandria, for relators.

Fred S. LeBlanc, Atty. Gen., M. E. Culligan, Sp. Asst. Atty. Gen., Ben F. Thompson, Dist. Atty., and Walter M. Hunter, Asst. Dist. Atty., both of Alexandria, for respondents.

HAWTHORNE, Justice.

Relators, F. L. Truby and Mrs. Amelia Truby, husband and wife, who were engaged in operating a cafe in the City of Alexandria, were charged with the crime of keeping a disorderly place, and were tried and convicted. Each was sentenced to serve six months in jail and to pay a fine of $300 and costs, and, in default of the payment of the fine and costs, to serve six additional months in the parish jail. They applied to this court for writs, which were granted with a stay order, and the matter is now before us under our supervisory jurisdiction.

The bill of indictment under which defendants were convicted charged that they " * * * from on or about the 1st day of January, 1946, to on or about September 22, 1946 with force and arms in the Parish, District and State aforesaid, and within the jurisdiction of the Ninth Judicial District Court, did willfully, maliciously and feloniously Intentionally maintain a place, to-wit: the premises at 721 Second Street in the City of Alexandria, Louisiana, to be used habitually as a meeting place for prostitutes and men desirous of their company and as a meeting place for criminals to plan and prepare for the commission of sundry crimes, contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the State."

In the court below, defendants filed a motion for a bill of particulars, in which they requested the State to inform them of the statute or law of the State of Louisiana under which they were being prosecuted and also to furnish certain other information. The State answered the motion for a bill of particulars, setting forth that the prosecution was being had and conducted under Article 104 of the Louisiana Criminal Code, Act No. 43 of 1942, but did not furnish the other information sought.

The defendants then filed a motion to quash the indictment, alleging that it did not charge any offense or violation of' any criminal laws or statutes of the State of Louisiana, and, further, that the indictment as drawn did not set forth with legal certainty any identification of the offense so as to enable them to understand with what they were being charged and enable them to prepare a defense, in violation of the Constitution of the State of Louisiana. This motion was overruled.

Defendants were then tried and convicted. Before sentence defendants, through counsel, filed a motion for a new trial and

a motion in arrest of judgment, both of which were overruled.

In the motion in arrest of judgment, defendants attack the constitutionality of Article 104 of the Criminal Code on the ground that it is violative of Article I, Section 10, of the Constitution, which provides that in all criminal cases the accused is entitled to be informed of the nature and cause of the accusation against him, and also on the ground that Article 104, in defining the crime of keeping a disorderly place, is vague and indefinite and leaves to the court the determination of the definition of the crime and is therefore null and void for the reason that the Legislature alone can define what constitutes a crime in this state.

Defendants also attack the bill of indictment and the article of the Criminal Code on other grounds, but, due to the view which we have taken, as hereinafter expressed, it is not necessary for us to consider these attacks.

Article 104 of the Louisiana Criminal Code reads as follows:

"Keeping a Disorderly Place is the intentional maintaining of a place to be used habitually for any illegal or immoral purpose.

"Whoever commits the crime of keeping a disorderly place shall be fined not more than three hundred dollars, or imprisoned for not more than six months, or both."

Defendants contend that this article does not supply any definition of the crime of "keeping a disorderly place" in that it does not define "illegal or immoral purpose," thus making it incumbent upon the court to supply the definition of these terms.

█ It is so well settled that citation of authority is unnecessary that in Louisiana there are no common-law crimes, and that nothing is a crime which is not made so by statute. The Criminal Code itself states this rule in Article 7, as follows:

"A Crime is that conduct which is defined as criminal in this Code, or in other acts of the legislature, or in the constitution of this state."

Article 3 of the Code on the subject of "Interpretation" provides:

"The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision."

█ In our efforts to construe the meaning, intent, and purpose of any article of the Code, we have full authority to consider the comments found thereunder, as pointed out in the case of State v. Davis, 208 La. 954, 23 So.2d 801. Article 104 of the Criminal Code in defining a disorderly place is broad in its scope, and that this is clearly recognized by the compilers of the Code is

shown by the following statement under "Comments" to this article and to Article 105, which deals with letting a disorderly place:

"In defining the crime a departure has been made from the usual definitions. A general definition seeks to include all types of disorderly houses and places known as such, or which might become known as such in the future. This eliminates the necessity of enumeration which is found in most statutes."

Defendants contend that the words "illegal" and "immoral" as used in the statute have no fixed and well defined meanings, and that the article leaves it to the court to determine what is an illegal or an immoral purpose, or what illegal or immoral purposes the Legislature had in mind, and that the word "immoral" might mean anything and might have different meanings in the minds of different people. They point out that an individual might be considered by some people to be immoral when he does not attend church regularly; when he does not contribute his share to charity; when he abuses his wife; when he is mean to his children; when he is wicked or vicious; when his principles are not so high as his neighbors'.

■ As to the word "illegal," we do not think that there is any merit in defendants' contention. To us the word as used in the statute clearly means "contrary to some criminal statute of this state" or "violative of some criminal statute." When the word "illegal" is given this meaning, the phrase "for any illegal * * * purpose" in the statute is clear and definite, leaves nothing for the court to determine, and definitely fixes the crime of keeping a disorderly place as the intentional maintaining of a place to be used habitually for any purpose contrary to the criminal laws or statutes of this state.

■ In so construing the meaning of the word "illegal," we are giving the statute a construction according to the fair import of its words, taken in their usual sense, in connection with the context, and with reference to the purposes of the provision, as set forth in Article 3 of the Criminal Code, quoted hereinabove.

This court has had occasion to define the word "unlawful," which is synonymous with "illegal." In State v. Bulot et al., 1932, 175 La. 21, 142 So. 787, 788, relators were charged with the violation of Act No. 7 of the Extra Session of 1872, Section 1 of which provided that "if any three or more persons, being armed with clubs or any other dangerous weapon or weapons, or if any ten or more persons shall *unlawfully assemble* * * * for any *unlawful purpose,* or with intent to disturb the public peace, or to cause public disturbance, the persons so assembled shall be deemed guilty of a misdemeanor," etc. (All italics ours.)

The relators in that case contended that the act was too vague and indefinite, in that the terms "unlawfully assemble" and "unlawful purpose" were not defined

with any degree of legal certainty. In the course of the opinion this court said:

" * * * The word *'unlawful'* means that which is not lawful or that which is contrary to some express provision of the law. The terms *'unlawfully assemble'* and and *'unlawful purpose,'* as here used, mean to assemble for the purpose of doing some act or thing which the law prohibits. So that, in order to determine whether a number of persons assemble for an unlawful purpose, it would be necessary to determine, first, what the purpose of the assembly was; and, second, whether the act intended to be done is prohibited by law. A reference to the statutes of the state would enable the court to determine whether the purpose of the assembly was lawful or unlawful. We think the statute is not amenable to this particular objection."

Although the court in that case found the terms "unlawfully assemble" and "unlawful purpose" to have a definite and fixed meaning, the statute there under consideration was declared unconstitutional on other grounds.

In the earlier case of State v. Holland, 1907, 120 La. 429, 45 So. 380, 381, 14 Ann. Cas. 692, defendants were charged and convicted under Section 805 of the Revised Statutes of 1870, which read as follows:

"Whoever shall forcibly seize and carry out of this state, or from one part of this state to another, or shall imprison or secrete any person *without authority of law,*

* * *, on conviction, shall be imprisoned, etc."

The bill of indictment charged that the accused "with force and arms, willfully, forcibly, and *unlawfully* and against her will, did seize and convey," etc. One of the objections urged to the indictment was that it omitted the words "without authority of law." This court said:

" * * * We consider that the word *'unlawfully'* necessarily implies 'without authority of law.' *An unlawful act is one contrary to law,* and hence without authority of law."

In Johnson v. State of Ohio, 66 Ohio St. 59, 63 N.E. 607, 608, 61 L.R.A. 277, 90 Am.St.Rep. 564, the statute under which plaintiff in error had been convicted read: "Whosoever *unlawfully* kills another * * * is guilty of manslaughter * * *." Rev. St. § 6811. Johnson caused the death of the deceased while riding a bicycle in a negligent manner. The court said that "the act committed when the unintentional killing occurs *must be a violation of some prohibitory law. The very word 'unlawful,' in criminal jurisprudence, means that, and nothing less.* * * * In our judgment, *the unlawful act, the commission of which gives color and character to the unintentional killing, is an act prohibited by law,* and that *such is the natural meaning of the term or clause when used in the parlance of criminal jurisprudence."* In this Ohio case, the court in its opinion pointed

out that in that state all crimes are statutory—as they are in Louisiana.

It is true that in the Bulot case, a decision of the Supreme Court of this state, as well as in the Ohio case, the court in each instance was construing the word "unlawful," while the word we are here construing is "illegal." However, as stated above, each of these words is a synonym of the other. See Webster's New International Dictionary (2d Ed.). According to Black's Law Dictionary (3d Ed.), these words are synonyms, but the word "illegal" more frequently implies or imports the violation or breach of the law.

Defendants, in support of their contention that the word "illegal" is vague and indefinite and has no fixed meaning in the article of the Criminal Code here under consideration, cite the case of State v. Savant, 115 La. 226, 38 So. 974. It is to be noted that this case was decided in 1905, some 27 years before the decision in the Bulot case, discussed above.

In the Savant case, the defendant was charged, convicted, and sentenced under Act No. 134 of 1890, the title to which read: "An act making the abduction of women a crime." Section 1 of that act provided that "any person who shall fraudulently * * * entice, abduct, * * * any woman of previous chaste character * * * for the purpose of prostitution or for any *unlawful* sexual intercourse, at a house of ill fame or at any other place of like character * * * shall on conviction be punished," etc.

In that case we said:

"The judge charged that unlawful sexual intercourse under the statute meant sexual intercourse out of wedlock. Defendant contends that it means only such sexual intercourse as is prohibited or made unlawful by some express provision of law; as, for instance, rape, incest, intercourse between a man over 18 and a girl under 16, etc. We think the judge ruled correctly. 'Unlawful' does not necessarily mean contrary to law. 'Un' is a preposition [prefix] used indiscriminately, and may mean simply 'not,' and 'unlawful' means 'not authorized by law.' McDaniel v. United States, [4 Cir.,] 87 F. 324, 30 C.C.A. 670. Again, in the phrase descriptive of the purpose of the abduction the words 'unlawful sexual intercourse' are closely associated with the words 'prostitution' and 'house of ill fame,' clearly indicating, under the rule noscitur a sociis, what character of unlawful sexual intercourse is meant; that is to say, such as is associated with prostitution and houses of ill fame—in other words, the infringement of the moral law, and not necessarily of the civil law; the popular, not the technical, meaning. * * *"

The rule noscitur a sociis is defined in Black's Law Dictionary as follows:

"It is known from its associates. * * * The meaning of a word is or may be known from the accompanying words. * * *

Under this rule general and specific words, capable of analogous meaning, when associated together, take color from each other, so that general words are restricted to a sense analogous to less general. * * *"

What the court did in the Savant case was to take the specific words, "prostitution" and "house of ill fame," and from these words give color to the more general phrase, "unlawful sexual intercourse," and thus restrict the general phrase to a sense analogous to the words of more specific meaning.

This rule, however, has no application to the article of the Code here under consideration, for in this article we find no closely associated words to help us in arriving at the meaning of the words "illegal" or "immoral" as used therein.

It might be further pointed out that in the case of State v. Sanders, 136 La. 1059, 68 So. 125, Ann.Cas.1916E, 105, which was decided in 1915, after the Savant case but prior to the Bulot case, this court recognized what had been pointed out in the Savant case, that is, that the crime charged in Act No. 134 of 1890 lay in the abduction, and that the words "for the purpose of prostitution, or for any unlawful sexual intercourse" were merely descriptive of the intent of the abduction. However, be that as it may, the court in the Bulot case, the last criminal case on the subject as far as we can ascertain, held in unequivocal terms that the word "unlaw-

ful" means prohibited by law, and that the phrase "unlawful purpose" means a purpose prohibited by law.

We therefore conclude that the word "illegal" as used in Article 104 of the Criminal Code has a definite and fixed meaning, that is, "contrary to, or prohibited by, some criminal statute."

It is true, as stated hereinabove, that in the construction of a provision of the Criminal Code the words used therein are to be taken according to their fair import, in their usual sense, in connection with the context, and with reference to the purposes of the provision. However, it is equally true that a penal statute must be strictly construed and cannot be extended to cases not included within the clear import of its language, and that nothing is a crime which is not clearly and unmistakably made a crime. Articles 3 and 7, Louisiana Criminal Code; State v. Breffeihl, 130 La. 904, 58 So. 763, 40 L.R.A.,N.S., 535, and authorities therein cited; State v. Comeaux, 131 La. 930, 60 So. 620.

In United States v. Reese et al., 92 U.S. 214, 221, 23 L.Ed. 563, the Supreme Court of the United States said:

"* * * Every man should be able to know with certainty when he is committing a crime.

* * * * *

"It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to

the courts to step inside and say who could be rightfully detained, and who should be set at large. * * *"

With this rule in mind, we now come to the consideration of the word "immoral" as used in Article 104 of the Criminal Code.

"Immoral Not moral; inconsistent with rectitude, purity, or good morals; contrary to conscience or moral law; wicked; vicious; licentious; as, an *immoral* man or deed. Cf. Unmoral. Syn.–Corrupt, indecent, depraved, dissolute. Cf. Bad. Ant.–Decent, upright, good, right. See Moral." Webster's New International Dictionary (2d Ed.).

"Immoral. Contrary to good morals; inconsistent with the rules and principles of morality; *inimical to public welfare according to the standards of a given community, as expressed in law or otherwise.* * * *" Black's Law Dictionary (3d Ed.)

In United States v. Lewis, 7 Cir., 110 F. 2d 460, 462, (Writs for certiorari denied 310 U.S. 634, 60 S.Ct. 1077, 84 L.Ed. 1404), defendants-appellants were prosecuted under an indictment charging violation of the so-called "White-Slave Traffic Act, 18 U.S.C.A. § 397 et seq. An offender under one of the provisions of the act is "Any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any Territory or in the District of Co-

lumbia, any woman or girl for the purpose of prostitution or debauchery, or *for any other immoral purpose* * * *."

In discussing the words "other immoral purpose," the court said:

"* * * Federal court decisions have held that the words 'other immoral purpose' do not add an element to the offense and that 'no proof could be offered of any immoral purpose, except such as are specifically mentioned, to wit, prostitution and debauchery.'

*   *   *   *   *

"The language of the statute and of the indictment, as construed by judicial decisions, is sufficiently definite to adequately describe the offense which the statute defines. Under the decisions the terms 'debauchery' and 'immoral purpose', by reason of association with the term 'prostitution', have been restricted in meaning to immorality consisting of sexual debauchery; and as thus limited by judicial decisions the language of the statute furnishes a sufficiently definite description of the condemned conduct. Furthermore, there is transportation 'for the purpose of prostitution or debauchery, or for any other immoral purpose' if there is transportation of a female for the purpose of having her 'engage in acts which tend ultimately to lead to that form of debauchery or immoral conduct which consists in "sexual actions." ' "

That decision is full authority for the proposition that the Federal courts, in con-

struing the White-Slave Traffic Act, have treated the words "other immoral purpose" when used alone as not being susceptible of a definite and fixed meaning, and have construed these words to mean "prostitution" and "debauchery" because of their association with the words "prostitution" and "debauchery," as it is set forth very clearly that the words "other immoral purpose" do not add an element to the offense, and that no proof can be offered of any immoral purpose except such as are specifically mentioned, to-wit, prostitution and debauchery.

In State v. Comeaux, 131 La. 930, 60 So. 620, the State appealed from a judgment quashing an indictment found against the defendant under Act No. 202 of 1912, which act read as follows:

"An Act to define and punish indecent assaults.

"Be it enacted * * * That whoever, with or without his or her consent, shall indecently assault or take any indecent liberties with any child, whether male or female, under the age of sixteen years; or who, without his or her consent, shall indecently assault or take indecent liberties with any person, over the age of sixteen years, shall be deemed guilty of an indecent assault and upon conviction," etc.

This court affirmed the judgment of the lower court quashing the indictment, saying:

"The title of the act reads: 'An act to define and punish indecent assaults.' The act nowhere defines the crime sought to be

punished. The act does not say what shall constitute an indecent assault, and the court is without authority to determine this matter. The defining of crimes, and the imposition of penalties for their commission, devolve upon the Legislature alone."

In the case of City of Shreveport v. Wilson et al., 1919, 145 La. 906, 83 So. 186, 187, relators were convicted of violating Section 4 of an ordinance of the City of Shreveport. The case was submitted to this court on a statement of facts, that is, that defendants lived together for a year or longer as man and wife but were not married; that they rented a house and occupied it alone; that the woman, E. Gardner, lived only with the man, Harry Wilson; that they thus lived together openly in a residential part of the city, at the number and on the street mentioned in the charge, and that it was generally known that they were not married. Section 4 of the municipal ordinance read as follows:

" * * * it shall be unlawful for any person to use or occupy any hotel, house, room or other building or place for the purpose of prostitution, assignation or *other lewd or indecent act,* in the city of Shreveport."

Before pleading to the charge, defendants filed a demurrer, contending that the municipal ordinance was unconstitutional, null, and void insofar as it purported to denounce the occupying or use of a house or room "for other lewd or indecent act" other than for prostitution or assignation,

because the ordinance did not define .any other act of indecency or lewdness.

This court, with Justice O'Niell as its organ, annulled the conviction and sentence and ordered that the prosecution be dismissed and the defendants released from custody, saying:

"The preamble of the ordinance does not mention or refer to any other lewdness or indecency than prostitution or assignation. A woman's living in concubinage with a man, having illicit sexual intercourse with him alone, is neither prostitution nor assignation, within the accepted meaning of the words. See State v. Thibodeaux, 136 La. 935, 67 So. 973. 'Lewdness' is not synonymous with 'concubinage.' 'Lewd' means lustful or lascivious. See Words and Phrases, vol. 5, p. 4108. According to the principle on which it was held that the Act No. 202 of 1912, purporting to denounce as a crime, without defining, an indecent assault upon a child or taking indecent liberties with a child, was invalid, the words 'or other lewd or indecent act,' in the ordinance in question, add nothing to the ordinance, except to make plain the meaning of 'prostitution' and 'assignation.' See State v. Comeaux, 131 La. 930, 60 So. 620."

It is noteworthy that the Federal court in United States v. Lewis, supra, and the Louisiana court in City of Shreveport v. Wilson, supra, reached the result that the general terms of themselves were too broad and indefinite, and restricted the meaning of the vague terms in the statutes—"lewd or indecent act" in the Louisiana case, "immoral purpose" in the Federal case—to the specific words used therein, and concluded that these vague terms added nothing to the statutes.

In State v. Rose, 147 La. 243, 84 So. 643, 646, defendant was charged with, and convicted of, a violation of Act No. 199 of 1912, which defined a disorderly house to be, among other things, any place in which lewd dancing was permitted. Defendant contended that the statute was invalid because it did not describe or define the kind of lewd dancing that the law undertook to prohibit or what made a house where such dancing is permitted a disorderly house. In other words, defendant contended that the statute was unconstitutional for the reasons that it did not inform the accused of the nature and cause of the accusation against him, and that it permitted the judicial department of the government to exercise a function which properly belonged to the legislative department. In affirming the conviction, this court said:

"Appellant concedes that the word 'dancing' is well understood, but he contends that the adjective 'lewd' has so many and diverse meanings that it does not definitely describe the kind of dancing that the statute undertakes to denounce as offensive. He reminds us that there is hardly a word in the English language that has only one meaning. *It is not in the abstract, however, that we find the exact meaning of a word, but in the context or combination*

*of words.* As counsel for appellant says, the word 'lewd' has no statutory definition, nor technical meaning. But it has, particularly when applied to dancing, the very well and generally understood and unmistakable meaning, indecent, lascivious, lecherous tending to excite lustful thoughts. * * *"

In that case, this court discussed the case of City of Shreveport v. Wilson, supra, and distinguished the two cases in the following manner:

" * * * In the case of the City of Shreveport v. Wilson et al., 145 La. 906, 83 So. 186, the defendants, who had lived together in concubinage, were prosecuted for violating a municipal ordinance making it 'unlawful for any person to use or occupy any house or room for the purpose of prostitution, assignation or other lewd or indecent act.' The ruling was that concubinage was not prostitution or assignation, within the ordinary meaning of the words, and that, in so far as the statute undertook to punish for any 'other lewd or indecent act,' the language was too vague and indefinite to inform a party accused 'of the nature and cause of the accusation against him.' "

In other words, when called upon to find the meaning of the words "lewd or indecent act" in City of Shreveport v. Wilson, the court was confronted with the problem of construing the adjectives "lewd" and "indecent," which may have more than one meaning, and the noun "act," which is also susceptible of more than one definition. Consequently, the phrase "lewd or indecent act" was held to be too vague and indefinite to define a crime with any certainty. On the other hand, when, in State v. Rose, the court was called upon to find the meaning of the phrase "lewd dancing," it had for its consideration a noun, "dancing," which has a specific, fixed, and well accepted meaning, and found that the adjective "lewd," when taken in its context as a modifier of "dancing," ceased to be ambiguous, and that therefore the phrase "lewd dancing" was sufficiently definite to charge a crime.

We feel that the case of City of Shreveport v. Wilson is more nearly applicable to the case here under consideration than is State v. Rose, because the phrase which we must construe is "immoral purpose," and not some "immoral" thing which has a specific and fixed meaning.

The word "immoral," as used in Article 104 of the Criminal Code, is, in our opinion, vague, indefinite, and uncertain, and thus it is left to the court to determine in any given case what constitutes an "immoral purpose" within the meaning of the article. For, as pointed out in Black's Law Dictionary, the word "immoral" means "inimical to the public welfare according to the standards of a given community, as expressed in law or otherwise." Since that which might be considered "immoral" in one locality or section of this state might not be deemed "immoral" in another locali-

ty or section, in any given case it is left to the court of the particular locality to determine and decide what constitutes and is an "immoral purpose."

■ It is well settled that the determination or definition of acts which are punishable as crimes is a purely legislative function which cannot be delegated to, or exercised by, the courts. For, as pointed out in United States v. Reese, supra, it would "certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."

In City of Shreveport v. Moran, 174 La. 271, 140 So. 475, an ordinance providing for fine for failure to abate a nuisance after conviction of committing a nuisance was held invalid and indefinite because it did not define "nuisance." This court said:

"What the council has done, it seems to us, is that it has simply penalized the commission of a nuisance, leaving it to the courts to decide, so far as appears from the record, what acts should be deemed to constitute the offense within the intendment of the ordinance, and then, if there is a failure to abate to impose the penalty.

"While not expressed in what may be termed a nuisance case, we think that the following views, expressed by the lower court and then approved by the Supreme Court, in the case of United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct.

298, 299, 65 L.Ed. 516, 14 A.L.R. 1045, are pertinent here to wit:

" 'Congress alone has power to define crimes against the United States. This power cannot be delegated either to the courts or to the juries of this country. * * *

" '*Therefore because the law is vague, indefinite, and uncertain, and because it fixes no immutable standard of guilt, but leaves such standards to the variant views of the different courts and juries which may be called on to enforce it,* and because it does not inform defendant of the nature and cause of the accusation, *I think it is constitutionally invalid,* and that the demurrer offered by the defendant ought to be sustained.'

"In commenting on these views the Supreme Court of the United States said:

" 'We see no reason to doubt the soundness of the observation of the court below in its opinion to the effect that, to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury.' "

In the case of State v. Gaster, 45 La.Ann. 636, 12 So. 739, 740 (which was cited with approval in the recent case of State v. Maitrejean, 193 La. 824, 192 So. 361), this court stated:

"This statute denounces as a crime, on the part of civil officers, 'any misdemeanor

in the execution of their respective offices.' It does not, on its face, undertake to define, in any manner, what acts are misdemeanors in office, and, unless there is some other law which furnishes such definition, *there is no other source to which we may look for it, except to the discretion of the judiciary, which, in each case brought before it, will be vested with determining whether or not the particular acts charged, ranging from the most trivial to the most serious derelictions, from the most malicious infractions of duty to the most innocent errors of judgment, shall or shall not be punished as a crime. This would operate a delegation to the judiciary of powers purely legislative, in flagrant violation of the constitutional prohibition."*

In our opinion on application for rehearing in the Gaster case we reiterated the rule as follows:

"* * * When the language used in criminal statutes has any clear and definite meaning, indicating the particular kind of acts which are made punishable, we should give liberal effect to the legislative intent. *But when, as in this case, the language employed is of such vague and indefinite import that it might embrace many acts which could not possibly have any criminal character, and leaves the discrimination between these and others to arbitrary judicial discretion, we are bound to hold the statute to be violative of constitutional rules referred to in our original opinion."*

█ Therefore, under the well settled rules of statutory construction, we must

necessarily conclude that Article 104 of the Criminal Code, Act No. 43 of 1942, insofar as it defines the crime of keeping a disorderly place as "the intentional maintaining of a place to be used habitually for any * * * immoral purpose," is unconstitutional.

█ Therefore, if a place is to come within the meaning of Article 104, which defines the crime of keeping a disorderly place, the purpose for which the place is habitually and intentionally maintained must be an "illegal purpose," a purpose prohibited by criminal statute.

█ The indictment in this case, which charges the defendants with "Intentionally maintaining a place * * * to be used habitually as a meeting place for prostitutes and men desirous of their company, and as a meeting place for criminals to plan and prepare for the commission of sundry crimes * * *," does not charge an "illegal purpose" within the meaning of the article here under consideration. We know of no statute, and none has been called to our attention, which prohibits prostitutes from merely meeting with men desirous of their company, although it is true that under Article 107 of the Criminal Code prostitutes and persons who habitually associate with them are vagrants. The crime of criminal conspiracy is defined in Article 26 of the Code as "The agreement or combination of two or more persons for the specific purpose of committing any crime;

*provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination."* Since the indictment in this case does not allege that an act was done in furtherance of a conspiracy to commit a crime, it does not allege the crime of criminal conspiracy. Consequently the indictment does not allege that the place was habitually maintained for an "illegal purpose."

A place such as is described in the indictment in this case is certainly against the public welfare, affects the general peace and order of the community, and is not conducive to orderly government. However, what was said in State v. Whitlock et al., 193 La. 1044, 192 So. 697, 700, is pertinent and applicable here, that is:

"Unless an act can be brought within the meaning of the words of a criminal statute, it is not a crime, though it comes within the mischief sought to be remedied, and is of equal atrocity with the acts enumerated and denounced by the statute. State v. Fontenot, 112 La. 628, 36 So. 630; State v. Brinson, 149 La. 320, 89 So. 18."

For the reasons assigned, the conviction and sentence of each defendant is annulled, and it is now ordered that the prosecution be dismissed and defendants released from custody.

O'NIELL, Chief Justice (dissenting).

The guaranty in the Bill of Rights, in Section 10 of Article 1 of the Constitution, that in all criminal prosecutions the accused shall be informed of the nature and cause of the accusation against him, is directed to the prosecuting officers rather than to the Legislature. The same guaranty is in the 6th Amendment of the Constitution of the United States, thus:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation."

In nearly all—if not quite all—of the decisions of the federal courts on the subject the 6th Amendment is regarded as the test of the sufficiency of the indictment or bill of information, and not as a test of sufficiency of the definition of the crime as given . in the statute. United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1875); Rosen v. United States, 1893, 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606; Bartell v. United States, 1913, 227 U.S. 427, 33 S.Ct. 383, 57 L.Ed. 583; Fontana v. United States, 8 Cir., 1919, 262 F. 283; Da Roza v. United States, 9 Cir., 1931, 48 F.2d 1025; White v. United States, 10 Cir., 1933, 67 F.2d 71; Rees v. United States, 4 Cir., 1938, 95 F.2d 784; Hale v. United States, 5 Cir., 1945, 149 F.2d 401; Beauchamp v. United States, 6 Cir., 1946, 154 F.2d 413. See also Cooley, Constitutional Law (4th ed. 1931) 366.

The same interpretation has been given by this court to Section 10 of Article I of the Constitution of Louisiana. State v. Schwartz, 1915, 137 La. 277, 68 So. 608; State v. Stringer, 1927, 162 La. 925, 111 So. 330; State v. Ritchie, 1931, 172 La. 942, 136 So. 11; State v. Wilson, 1931, 173 La. 347, 137 So. 57; State v. Pete, 1944, 206 La. 1078, 20 So.2d 368; State v. Varnado, 1945, 208 La. 319, 23 So.2d 106. See also 1 Marr, Criminal Jurisprudence in Louisiana, 81, 300, 481.

From a practical standpoint it would be impossible for the Legislature in defining such a crime as keeping a disorderly place to enumerate the multitudinous and various methods by which such an offense could be committed. All that should be necessary in that respect is for the statute to define the crime in general but unmistakable terms. In this instance the term "immoral purpose," especially when used in the context, "to be used habitually for any illegal or immoral purpose," is as understandable as any of the words that might be employed in an attempt to define the word *immoral*. The offense consists in the intentional maintaining of a place to be used *habitually* for any illegal or immoral purpose. The constitutional guaranty is preserved if the prosecuting attorney, in the indictment or bill of information, or in a bill of particulars, sets forth specifically the immoral purpose for which the place is alleged to have been habitually used. There is no more reason why the statute should under-

take to set forth specifically the immoral purpose which shall be essential to constitute the offense than there is for the statute to state how often the place shall be used for the immoral purpose in order to make such use *habitual*.

The word *habitual* appears in at least six articles of the Criminal Code, without being defined. For example, I refer to Article 76, defining the crime Bigamy, Article 79, defining Miscegenation, Article 84, defining Pandering, Article 92, defining Contributing to the Delinquency of Juveniles, Article 104, with which we are now dealing, and Article 107, defining Vagrancy, and using the term *habitual drunkards*. The word *habitual* is not less vague or indefinite in its meaning than the word *immoral*. We know of course that the word *habitual* means according to habit, and that its most appropriate synonym is the word *customary*. It would be impossible to define the word *immoral* in words more easily understood than the word *immoral*. That is demonstrated by the definition given by all of the lexicographers, that is, "not moral, inconsistent with rectitude, contrary to conscience or moral law, wicked, vicious, licentious." But none of these words is more commonplace than the word *immoral*. The rule of interpretation most applicable is stated in Article 3 of the Criminal Code,—in quoting which article I italicize the provisions which are particularly pertinent, thus:

"The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, *according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.*"

Taking the word *immoral* as used in Article 104, and *in its usual sense*, in connection with the context, and particularly in connection with the word *habitually*, it appears to me that the statute embraces clearly in its meaning a rendezvous for prostitutes and men desirous of their company. That the draftsmen of the Criminal Code thought so is shown by their comment on Article 105, giving us an example of a disorderly house, thus:

"The habitual assembling there of lewd women, and men desirous of their company, is repulsive to the public, and tends to scandalize the neighborhood. It is the corruption of the morals, honesty and good habits of the people that constitutes the nuisance."

I cannot imagine a better precedent for a ruling in this case than the decision in State v. Rose, 1920, 147 La. 243, 84 So. 643, where it was held that a statute, Act No. 199 of 1912, which made it a misdemeanor to keep a disorderly house, and which gave as one of the definitions of a disorderly house "any place in which lewd dancing is permitted," was a valid statute notwithstanding there was no statutory definition of the term lewd dancing.

I recognize of course that a criminal statute which gives no definition whatever of the offense intended to be denounced as such is not a valid statute. In State v. Gaster, 1893, 45 La.Ann. 636, 12 So. 739, it was held that Section 869 of the Revised Statutes, which undertook to punish any civil officer who should be guilty of "any misdemeanor in the execution of [his] office" should upon conviction suffer fine and imprisonment, etc., was not a valid statute because of the failure to define the offense referred to as "any misdemeanor" committed in the execution of the office of any civil officer. But, even in that case, where the law gave no definition whatever of the so-called "misdemeanor in office," the court in its refusal to grant a rehearing took occasion to say:

"In conclusion, we may say that we have not laid down any technical rules of precision in the definition of the acts constituting penal offenses. When the language used in criminal statutes has any clear and definite meaning, indicating the particular kind of acts which are made punishable, we should give liberal effect to the legislative intent. But when, as in this case, the language employed is of such vague and indefinite import that it might embrace many acts which could not possibly have any criminal character, and leaves the discrimination between these and others to arbitrary judicial discretion, we are bound to

hold the statute to be violative of constitutional rules referred to in our original opinion."

My apprehension is that the majority opinion rendered in this case will be deemed by the profession to be not less applicable to many other articles of the Criminal Code than it is to Article 104, and will be invoked for the destruction of these many other articles of the Criminal Code.