57 So.2d 177

STATE v. SIMS.

No. 40518.

Jan. 14, 1952.

Isaac Wahlder, Alexandria, for defendant-appellant.

Bolivar E. Kemp, Jr., Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Ben F. Thompson, Jr., Dist. Atty., and George M. Foote, Asst. Dist. Atty., Alexandria, for appellee.

McCALEB, Justice.

Appellant was charged, tried and convicted of the offense of "criminal neglect of family" in that he intentionally deserted and failed to support his illegitimate minor child, in destitute circumstances, in violation of LSA–R.S. 14:74, as amended by Act No. 164 of 1950.[1] Following the imposition

1. The statute reads, in part:
    "Criminal neglect of family is the desertion or intentional non-support:

    *      *      *      *      *

"By either parent of his minor child, whether legitimate or illegitimate, who is in destitute or necessitous circumstances. Solely for the purpose of determining the

of a sentence to serve 12 months in the parish jail, he prosecuted this appeal relying, in the main, on a motion to quash the bill of information for annulment of his conviction.

The allegations of the bill of information, as enlarged by certain facts furnished by the State in response to a motion for a bill of particulars, reveal that the minor child was born on January 25th, 1944 to an unwed mother and that appellant was a married man at that time. Accordingly, if appellant is the father, the child is an adulterous bastard (Article 182, Civil Code), and could not be lawfully acknowledged (Article 202, Civil Code). Therefore, it is apparent that the case is controlled by our rulings in State v. Jones, 220 La. 381, 56 So.2d 724, and State v. Randall, 219 La. 578, 53 So.2d 689 and discussion of other grounds for reversal urged by appellant's counsel would be superfluous.

In State v. Jones, our most recent decision on this subject (handed down on December 10th, 1951), it was held that Act No. 164 of 1950, making it a crime for a parent to desert or intentionally fail to support his destitute illegitimate as well as legitimate child, was applicable only to those cases wherein the illegitimate child had been acknowledged by the parent in the manner required by the Civil Code or had been de-

clared as such by judgment rendered in an appropriate civil proceeding. It was resolved that, unless a civil obligation had been previously imposed upon the alleged father of the illegitimate child, criminal responsibility could not ensue and that it was unthinkable that the Legislature intended to repeal, by implication, the provisions of our Civil Code respecting the duties of parents towards their illegitimates, Articles 238 through 245 of the Civil Code, or bring about such an unjustified paradox so as to render one criminally liable for failure to furnish sustenance to a child by reason of a civil filiation when the substantive law, under which the status was established, did not impose the obligation of support.

The District Attorney, who represented the prosecution in State v. Jones,[2] and the Attorney General evidently believed that decision to be sound as they did not avail themselves of the right to apply for a rehearing and judgment in that matter has become final since the submission of this appeal. Hence, forasmuch as State v. Jones governs this case, which involves an alleged adulterous bastard to whom acknowledgment by appellant would be ineffective for any purpose including the child's claim for alimony, see Article 242 of the Civil Code, further comment would be unnecessary but for the dissension of a minority of

obligation to support, the court shall admit proof of paternity or maternity, or both".

2. He also represents the State in the instant case and readily concedes, in his brief, that our decision in State v. Jones governs the result to be reached in this matter.

the Court who contend that the Jones opinion is incorrect.

In deference to the views of our colleagues, we have undertaken to reexamine the reasoning upon which the ruling in State v. Jones is based. However, our study has served only to strengthen our confidence in the correctness of the opinion. The attack on State v. Jones, as we understand it, is predicated on the theory that Act No. 164 of 1950, in rendering criminal the failure to support an illegitimate child, is not, impliedly or otherwise, conditioned upon a civil duty of the parent to furnish support but only upon the factual relationship of sire and offspring plus, of course, necessitous circumstances of the latter. It ·is at once obvious that, if this view be accepted, then our other recent decision under Act No. 164 of 1950, State v. Randall, supra, is likewise erroneous as the evidence which we there found to be inadmissible—i. e., that Randall was the true father of the child despite the fact that the mother was married to another man at the time of its conception and birth—should have been received for the purpose of establishing Randall's duty of support. In that case, it was reasoned, correctly so we think, that we must look to the ·substantive law for guidance in determining the type of evidence which may be admitted and that, since Article 184 of the Civil Code provides a legal presumption that the husband of the mother was the father of the child conceived ·during the marriage, the State could not show otherwise inasmuch as the provisions of Act No. 164 of 1950 did not justify a holding that they had effected an implied repeal of the codal articles.

▆▆ But, be this as it may, we think that Act No. 164 reveals an unmistakable intention that the neglect, to be criminal, must be conditioned on a civil obligation or duty for, after declaring that it is a "criminal neglect of family" for a parent to intentionally fail to support his minor destitute child "whether legitimate or illegitimate", the statute declares that: "Solely for the purpose of determining the obligation to support, the court shall admit proof of paternity or maternity, or both".

·It is our understanding that the minority interpret this clause as simply meaning that factual proof of paternity or maternity suffices to render the conduct criminal, when the child is in necessitous circumstances. While it is to be conceded that a mere literal reading of the statute might provide some support for this construction, it seems to us that, when consideration is given to the basic family relationship upon which laws of this sort are founded, it is more reasonable to conclude that the Legislature did not intend to punish an act or course of conduct for which no civil responsibility is imposed. Indeed, the clause authorizing the admission of proof of paternity "Solely for the purpose of determining the obligation to support" necessarily recognizes that there must be an obligation to support in order for the act to become criminal. But the statute singularly fails to set out when

and under what conditions the obligation to support arises. Hence, perforce, as stated in the Jones case, reference must be made to the substantive law in order to ascertain the existence of the duty. In cases of legitimate children, proof of the birth during marriage establishes, of course, the obligation to support. Article 227, Civil Code. But this is not true of illegitimates[3] as they are not part of the family, Article 238, Civil Code, and the father only incurs responsibility for their upkeep when he has legally acknowledged them or they have been declared to be his children by a judgment duly pronounced in cases where proof of paternal descent may be admitted. Article 242, Civil Code.

■ The construction given Act No. 164 of 1950 in the Jones case appears to be in harmony with another provision of our Criminal Code, Act No. 43 of 1942 which has been reenacted as Title 14 of the LSA–Revised Statutes of 1950. Article 18 thereof, LSA–R.S. 14:18,[4] is a general provision dealing with justifiable conduct. It provides:

"The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:

\*    \*    \* .   \*    \* .   \*

"(3) When for any reason the offender's conduct is authorized by law; \* \* \*".

If Act No. 164 of 1950 should be viewed as rendering appellant's conduct criminal, although he had no legal duty to furnish support to the child, then the applicability of LSA–R.S. 14:18 to the case seems manifest. Under paragraph (3) of the Article, appellant's failure to support was fully justifiable as his conduct was "authorized by law" in that no legal obligation is imposed upon the father to furnish support to his alleged adulterous bastard.

Although authorities from other jurisdictions are not usually of much assistance in matters of this kind, due to fundamental differences between our civil law and the common law, we have not overlooked the pronouncements of the courts of other states on this question. While we find that many of the adjudications are distinguishable because of the particular verbiage of

3. Illegitimate children fall into two categories under our law—natural children, which are those who have been acknowledged by their father, and bastards, whose father and mother were incapable of contracting marriage at the time of conception, or whose father is unknown. Article 202, Civil Code.

4. In the comments on Article 18, the redactors observe: "The importance of this article of the Code cannot be exaggerated. In all or the succeeding articles defining various crimes, usually no mention is made of the possibility that the offender's conduct may under some circumstances be 'justified'. Reference must be made to this article to discover the bases for 'justified' conduct".

the statutes involved, it appears that our view, that legislation making it criminal for a parent to intentionally fail to support his illegitimate minor child in necessitous circumstances is to be confined to those cases in which a civil duty is imposed upon the parent to furnish support, prevails in New Hampshire, New Jersey, Alabama, Missouri and West Virginia.[5] Contrary rulings have been made in California, Colorado, Delaware, Massachusetts, Nebraska, North Carolina and Pennsylvania.[6]

The conviction and sentence are annulled and appellant is ordered discharged.

FOURNET, C. J., concurs and assigns written reasons.

HAMITER, J., dissents.

HAWTHORNE, J., dissents and assigns written reasons.

FOURNET, Chief Justice (concurring).

In view of the observation in the dissenting opinion that the "decision of this court in State v. Jones, 220 La. 381, 56 So.2d 724, was erroneous and should not be followed" in the determination of the instant case, and that the reasoning in the Jones case is unsound for the asserted reason that the court failed to apply the rule laid down in Article 3 of the Criminal Code —providing that "The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision."— in interpreting LSA–R.S. 14:74, dealing with criminal neglect of family, I feel that as the author of the opinion in the Jones case I should point out, in concurring with the views ably and well expressed in the majority, that the court, in deciding the Jones case, did literally follow the directive laid down in Article 3 of the Criminal Code, which is, in effect, nothing more than the universally accepted rule governing the construction of penal laws.

The statute on which the prosecution in the instant case and in the Jones case is

---

5. State v. Byron, 79 N.H. 39, 104 A. 401; Porter v. Wainright, 104 N.J.L. 51, 139 A. 394; Coan v. State, 224 Ala. 584, 141 So. 263; Morgan v. State, 28 Ala.App. 241, 182 So. 466, certiorari denied 236 Ala. 381, 182 So. 468; State ex rel. Canfield v. Porterfield, 222 Mo.App. 553, 292 S.W. 85 and Holmes v. Clegg, 131 W.Va. 449, 48 S.E.2d 438.

6. People v. Stanley, 33 Cal.App. 624, 166 P. 596; People v. Hamil, 73 Cal.App. 649, 238 P. 1075; Walmsley v. People, 64 Colo. 521, 173 P. 425; State v. Richardson, 1 W.W.Harr.,Del., 14, 110 A. 660; Commonwealth v. Gross, 324 Mass. 123, 85 N.E.2d 249; Craig v. Shea, 102 Neb. 575, 168 N.W. 135; State v. Spillman, 210 N.C. 271, 186 S.E. 322, 323 and Commonwealth v. Wibner, 29 Pa. Dist. 67, affirmed 73 Pa.Super. 349.

based LSA–R.S. 14:74, as amended by Act No. 164 of 1950, the italicized portion thereof being the addition under the amendment, provides:

"Criminal neglect of family is the desertion or intentional non-support:

"(1) By a husband of his wife who is in destitute or necessitous circumstances; or

"(2) By either parent of his minor child, *whether legitimate or illegitimate,* who is in destitute or necessitous circumstances. *Solely for the purpose of determining the obligation to support, the court shall admit proof of paternity or maternity, or both.*

"*Whenever a husband shall have left his wife in destitute or necessitous circumstances and has not provided her with means of support within sixty days thereafter, his failure to so provide shall be presumptive evidence that at the time of leaving he intended desertion and non-support. When either parent shall have left his minor child, whether legitimate or illegitimate, in destitute or necessitous circumstances and has not provided support within sixty days thereafter, his failure to so provide shall be presumptive evidence that at the time of leaving he intended desertion and non-support.*

"Whoever commits the offense of criminal neglect of family shall be fined not more than five hundred dollars, or imprisoned for not more than one year, or both; and if a fine should be imposed, the court

may direct it to be paid in whole or in part to the wife, or to the tutor or custodian of the minor child or children, or to an organization or individual approved by the court as fiduciary for such wife or child."

In construing the foregoing provision in the Jones case, it was stated: "From a study and analysis of the statute and its historical background the conclusion is inescapable that the Legislature, by its adoption of Act No. 164 of 1950, *extending the offense of criminal neglect of family to include desertion and intentional non-support of illegitimate children,* intended thereby to coerce the unwilling parent to fulfill his *legal* obligation to such child. Under our substantive law it is only those fathers who have legally acknowledged their illegitimate offspring or who have been judicially declared to be the father of such offspring, who have a legal obligation to support them, see Art. 238 et seq., Revised Civil Code, to be found in Section 2, 'Of the Duties of Parents towards Their Illegitimate Children * * *,' under Title VII, 'Of Father and Child'. (The emphasis has been added by me.)

"The statute prior to its amendment in 1950 is an exact replica of Article 74 of the Criminal Code, adopted by the Legislature in 1942. Some two years after the adoption of the said Code this Court, in the case of State v. Clark, 208 La. 1047, 24 So.2d 72, 73, in reversing the conviction and sentence of the defendant on a charge of criminal neglect of family by the intentional de-

sertion and non-support of his wife, held that it was error for the trial judge not to allow the defendant to show that he did not leave the complaining witness without just cause, for 'it is elementary that there can be no desertion if, under our law, the defendant had the right to and was justified in leaving the matrimonial domicile, and that *there can never be an intentional non-support of a wife or child if there is no legal duty or obligation on the part of the husband and father to support them.*' (Italics supplied.)

"Despite this decision by a unanimous court in 1945, the Legislature, in adopting the Revised Statutes of 1950, reproduced Article 74 of the Criminal Code verbatim as LSA–R.S. 14:74, and in subsequently amending and reenacting this section, LS A–R.S. 14:74, at the Regular Session of 1950, simply extended the offense of criminal neglect of family to include illegitimate minor children, and, in addition, provided a presumption of intention as to desertion and non-support.

"Criminal laws are strictly construed; only those acts are offenses which are clearly made so by the language of the statute, which cannot be extended further. LSA–R.S. 14:7; State v. Reed, 188 La. 402, 177 So. 252; State v. Whitlock, 193 La. 1044, 192 So. 697, and cases therein cited; State v. Truby, 211 La. 178, 29 So.2d 758; State v. Duncan, 219 La. 1030, 55 So.2d 234. The statute by clear implication, if not directly, declares that it is only a father under a legal duty or obligation to support his minor child who fails to do so, who is guilty of criminal neglect of family. This we think is clearly indicated by the definition of criminal neglect of family as being *'desertion* or *intentional non-support:* (1) * * (2) By either parent of his minor child, whether legitimate or illegitimate * *,' as well as the provision declaring that 'When either parent shall have *left* his minor child, whether legitimate or illegitimate, in destitute or necessitous circumstances and has not provided support within sixty days *thereafter,* his failure to so provide shall be presumptive evidence that at the time of *leaving* he intended desertion and non-support.' "

There was only one dissent in the Jones case, but no reasons therefor were given. In concurring in that case, the author of the present dissenting opinion stated he was in accord with all of the views expressed with the exception of the one holding that Article 74, as amended, should be given a strict construction, it being his opinion that since the statute is in the Criminal Code of this state, "it must be interpreted in accordance with the directive in the Code on interpretation of its provisions." Article 3, above quoted. He was also of the opinion that the comments under this article "disclose that it was the purpose of the drafters of the Code to depart from the rule of strict interpretation applicable to criminal statutes in interpreting the articles of the Criminal Code."

This is not the view formerly adhered to by my learned brother, for in applying the rules of interpretation laid down in Article 3 in the case of State v. Truby, 211 La. 178, 29 So.2d 758, 762, quoted with approval in the Jones case, he said: "It is true, as stated hereinabove, that in the construction of a provision of the Criminal Code the words used therein are to be taken according to their fair import, in their usual sense, in connection with the context, and with reference to the purposes of the provision. However, it is equally true that *a penal statute must be strictly construed and cannot be extended to cases not included within the clear import of its language, and that nothing is a crime which is not clearly and unmistakably made a crime."* (The emphasis has been added by me.)

The holding in the Truby case was criticized by the attorneys representing the state in State v. Vallery, 212 La. 1095, 34 So.2d 329, 331, and we were asked to reconsider our decision in the Truby case in the light of an article appearing in 21 Tulane Law Review 545, written by one of the draftsmen of the criminal code, wherein he expressed the fear that the code would fail in its entirety unless the court ceased to follow the traditional rule of "strict interpretation" in interpreting these criminal statutes. This was also the view held by the judge who tried the Vallery case in the lower court. In disposing of this argument, the court, *in a unanimous opinion,* stated: "With all due respect to the opinions entertained by the learned trial

judge and the author of this treatise, we think the error in their ratiocination lies in the fact that under our basic law no one can be held accountable, or subjected to criminal prosecution, for any act done by him unless and until that act has been denounced as a crime and has been made punishable in a statute that defines the act sought to be denounced with such precision the person sought to be held accountable will know his conduct is such that it falls within the purview of the act intended to be prohibited."

If there is any doubt as to the intention of the Legislature in adopting Article 3, and it needs further clarification, we think the comments thereunder, which we are admonished to consider in construing these articles (State v. Davis, 208 La. 954, 23 So. 2d 801; State v. Truby, 211 La. 178, 29 So.2d 758; State v. Logan, 213 La. 451, 34 So.2d 921; State v. Brown, 214 La. 18, 36 So.2d 624), clearly demonstrates the correctness of the majority view. In these comments it is stated: *"A distinction between civil and criminal statutes with reference to interpretation is preserved.* Article 3 expressly states that the analogical projection usually permitted in handling civil statutes is not available in interpreting this Code. Also, the principle nullum crimen sine lege is expressly preserved by this article and by *Article 7."* (The emphasis has been added by me.)

In changing his position with respect to the Jones case, my learned brother obvious-

ly overlooks the position he took in the Truby and Vallery cases, and also these comments under Article 3, for he now takes the position that this article authorizes the widest latitude of liberality in the interpretation of criminal statutes, and, in attempting to determine the purpose for which LSA–R.S. 14:74, as amended, was enacted, he relies on quoted excerpts from 50 American Jurisprudence, 279, 283, §§ 298 and 303, dealing with the interpretation of general statute, ignoring the rules laid down in Sections 407–422 of this same work, which deal *specifically* with penal laws, and wherein it is stated to be the well settled rule that these statutes are strictly construed, the object being "to establish a certain rule, by conformity to which mankind would be safe, and the discretion of the court limited." Or, as stated more forcefully and graphically in United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563, *quoted with approval by my learned brother in the Truby case,* "Every man should be able to know with certainty when he is commiting a crime. * * * It would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."

He also ignores the rule which provides that "The mischief at which a penal statute is aimed may not be given the same consideration in its interpretation as is permissible in the case of statutes not subject to a strict construction" (Section 416), and that "a construction is to be avoided which will overturn long established principles of law." Section 411. (These two sections are to be found in 50 American Jurisprudence, verbo Statutes.)

In reasoning that the words "illegitimate child" have a commonly accepted and well defined meaning that is understood by everyone, laymen as well as lawyers (i. e., one born out of wedlock), and that when this meaning is considered in the light of the purpose of this statute penalizing parents who fail to support such children (i. e., to prevent them from becoming public charges), "it is impossible to reach the conclusion arrived at by the majority," my colleague not only overlooks all of these universally accepted rules for the construction of criminal statutes (including our own), and the further fact that while the words "illegitimate child" may have an ordinary dictionary meaning and definition that is well known to laymen, they have a different meaning in law that is unknown to laymen although well known to lawyers; but also the cardinal principle of construction in criminal statutes that "the court should adhere to the limitation and definite sense to which long established legal usage has restricted it," where the meaning of a word is difficult to ascertain. 50 American Jurisprudence 437, § 413.

The conclusion that "there is no legal basis for the reasoning of the majority

that a corresponding civil obligation must be found before a criminal statute penalizing a failure to act can be enforced," is predicated on the false premise that the criminal statute is, in itself, sufficient to compel the father to support all of his illegitimate children, whether acknowledged or not. The statute contains no such requirement, and the author of the dissenting opinion has not pointed to any language from which such a conclusion can be reached, as he cannot. As was pointed out in the majority view in the Jones case, the language of this statute not only fails to make it the duty or obligation of the father of illegitimate children to support his offspring, but, instead, and particularly when considered in the light of the historical background of the statute, clearly demonstrates the Legislature intended the act to apply only where there was an obligation to support, since it specifically declares the court shall admit proof of paternity or maternity or both, *"Solely for the purpose of determining the obligation to support"*. It is obvious, therefore, that where there is no legal duty or obligation to support, there can never be any "intentional non-support." It is difficult for me to see how anyone can be coerced by means of criminal prosecution to do something that the law says he does not have to do, and is not obligated to do. (Emphasis added.)

I am at a loss to understand how my colleague reached the conclusion he did in the light of the very authorities he cited to support the same, for a perusal of these authorities readily discloses they not only do not support his reasoning and conclusions, but are, rather, authority for the majority view.

For example, in the case of Allen v. Hunnicutt, 230 N.C. 49, 52 S.E.2d 18, 19, it is stated: "Under the common law an illegitimate child is nullius filius, and its putative father is under no obligation to support or contribute to its support. It has no father known to the law, no distinction being made between a reputed father and an admitted father. * * * Accordingly, the courts in states which have adopted the common law have held in almost every case in which the question has been raised that without legislation the father of an illegitimate child cannot be required to provide for its support. * * *

*" 'It is universally held that a statute must be found imposing the obligation on the putative father before he can be charged with the child's support.'* * * * the natural obligation of the father to support will be enforced under the statute recognizing the obligation *and imposing the duty."* (Emphasis has been added.)

As another example of the authorities cited, the writer in the note in 28 North Carolina Law Review 119, commenting on the Hunnicutt case, says: "Cases abound commenting that *the father has no duty to support his illegitimate children except as provided by statute."* The further comment in this note is that *"such statutes are to*

*be strictly construed."* (Emphasis has been added by me.)

Whatever solace can be derived from the observations in Dr. Daggett's treatise on her report of the Louisiana Children's Code Committee, there is nothing in the report that would support the conclusions in the dissenting opinion. After Dr. Daggett forcibly draws attention to the fact that in this state there is no proper statutory means for compelling a father to support his unacknowledged illegitimate children or to force him to acknowledge them (as was pointed out in the dissent), she then submits the method by which this may be corrected in the form of a proposed act setting out the necessary procedure. Under this model statute it was to have been the duty of the State Board of Public Welfare to institute proceedings to establish the paternity of illegitimate children within 18 months after birth. Section 3 thereof was to provide: *"If the defendant be adjudged to be the father of such child, he thenceforth shall be subject to all the obligations for the care, maintenance and education of such child, and to all the penalties* for failure to perform the same, which are or shall be imposed by law upon the father of a legitimate child of like age and capacity." (Significantly, this statute was never adopted by the Legislature.) A section similar to Section 3 of Dr. Daggett's proposed statute is to be found in what is termed the Uniform Illegitimacy Act, which was approved by the National Con-

ference on Uniform Laws in 1922, and on which statute all of the statutes of the various states are more or less patterned. Section 3 of the Uniform Illegitimacy Act makes it a criminal offense for a father to fail to support his children born out of wedlock where his *"paternity has been judicially established."* That imposition of the duty and judicial establishment of the paternity are prerequisites to criminal prosecution for failure to support such children is imperative is clearly demonstrated by a survey of the statutes of the various states, to be found at pages 260–262 of Vernier's American Family Laws, Volume IV. (Emphasis added by me.)

Finally, the statement that a rehearing was not asked for in the Jones case "because the statute is 'unpopular' with certain law enforcement officers because it gives them a great deal of work and trouble in its application", and that "some of these officials, whose duty it is to enforce the law and to assist this court in upholding the validity of criminal statutes, are satisfied and pleased with the decision of the court in that case," would, ordinarily, require no comment, as it can have no bearing on the proper construction of the statute under which the defendant is charged. I think it proper to observe, however, that this statement is most unfair to these public officials (and indirectly to this court), since there is nothing in the record to support it. Moreover, to assume, as did my learned brother, that the courts in construing statutes and public officials in enforcing them

are motivated by the unpopularity thereof, is in direct contravention of that fundamentally sound presumption upon which our very system of democratic government is founded, that is, that all public officials will observe the oath of office they have taken.

HAWTHORNE, Justice (dissenting).

After further deliberation I am of the opinion that the decision of this court in State v. Jones, 220 La. 381, 56 So.2d 724, was erroneous and should not be followed in this case, although I signed that opinion when it was rendered. Unfortunately, I was forestalled from making known in that case my change of opinion because the State did not see fit to ask the court for a rehearing. Contrary to the reason given in the majority opinion for the failure to apply for the rehearing, a rehearing was not asked for because the statute is "unpopular" with certain law enforcement officers because it gives them a great deal of work and trouble in its application. Furthermore, some of these officials, whose duty it is to enforce the law and to assist this court in upholding the validity of criminal statutes, are satisfied and pleased with the decision of the court in that case, which has the effect of nullifying the statue insofar as it is applicable to illegitimate children unless they are acknowledged in the manner provided by law.

I am of the opinion that the reasoning in that case and in this one is unsound for several reasons. By referring to the Civil

Code and applying its provisions in this criminal matter, the court has completely disregarded the rules set out in the Criminal Code, LSA–R.S. 14:1 et seq., to be used as a guide by the courts in interpreting its provisions. Article 3 of the Code admonishes us that, " * * * in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, *taken in their usual sense,* in connection with the context, and *with reference to the purpose of the provision".* The words "illegitimate child" have a commonly accepted and well defined meaning, and are well understood by everyone, laymen as well as lawyers. An illegitimate child is one born out of wedlock. When this meaning is considered in the light of the *purpose* of provisions requiring the support of such children, it is impossible to reach the conclusion arrived at by the majority. (All italics mine.)

The provision of Article 3 of our Code authorizing the courts to look to the purpose of the statutes in applying them is a generally recognized rule of statutory construction. It has been said that:

"In construing a law of doubtful meaning or application, the policy which induced its enactment, or which was designed to be promoted thereby, is a proper subject for consideration, where such policy is clearly apparent or can be legitimately ascertained. Indeed, the proper course in all cases is to adopt that sense of the words which pro-

motes in the fullest manner the policy of the legislature in the enactment of the law, and *to avoid a construction which would alter or defeat that policy, where the construction · in harmony with the policy is reasonably consistent with the language used.* * * *

* * * * * *

"The purpose for which a statute is enacted is of primary importance in the interpretation thereof. Indeed, a statute is often regarded as speaking as plainly by means of the purpose which underlies it as in any other manner. In any event, in the interpretation of a statute of doubtful meaning, it is proper to take into consideration its purpose or object, or the aim, design, motive, or end in view, or the aspirations intended to be efficiently embodied in the enactment. The construction of the statute should be made with reference to the purpose of the statute, or in the light thereof, and in harmony and conformity therewith, in order to aid, advance, promote, subserve, support, and effectuate such aim, design, motive, end, aspirations, or object.

"* * * *Under these rules, a construction should be avoided which would operate to impair, pervert, frustrate, thwart, nullify, or defeat the object of the statute.* * · * *" 50 Am.Jur., Statutes, §§ 298, 303, pp. 279, 283.

With these rules in mind, it is appropriate now to examine the purpose of the statute involved here. Statutes which compel fathers to support their illegitimate children are enacted for the *purpose* of preventing those children from being charges of the State and the community. 3 Vernier, American Family Laws, § 162, p. 112; 4 ibid., § 234, p. 60; Note, 28 North Carolina L.Rev. 119; Note, 15 Fordham L.Rev. 282; Note, 4 Tulane L.Rev. 315; Note, 11 Cornell L.Quar. 245; see Allen v. Hunnicutt, 230 N. C. 49, 52 S.E.2d 18. Furthermore, criminal statutes have been enacted to provide relief where there is no effective civil remedy. 3 Vernier, op.cit. supra. A policy which allows these children to become charges of the State tends to pauperize its citizens and is seriously detrimental to the public welfare. It was appropriately pointed out by Mrs. Harriet Spiller Daggett in 1933 in her report on the work of the Children's Code Committee, of which she was chairman, that this state was without a means of relief for cases where the father takes care *not* to acknowledge the child and where financial assistance from him for the mother and child is necessary and just. She also pointed out that Louisiana, Texas, and Virginia were the only states which did not compel the father to support his illegitimate child. See Daggett, A Compilation of Louisiana Statutes Affecting Child Welfare and The Report of the Louisiana Children's Code Committee 343 (1933). It cannot be denied that an unacknowledged child in need of support is as costly to the State as an acknowledged one. It is my opinion, therefore, that the court in ignor-

ing completely the plain terms and the purpose of the statute has misconstrued it.

There is no legal basis for the reasoning of the majority that a corresponding civil obligation must be found before a criminal statute penalizing a failure to act can be enforced. Since the criminal statute itself is sufficient to *require* the parent to support his illegitimate child, I am at a loss to understand why the majority feel that, in order to ascertain whether there is a duty to support, they must resort to the Civil Code, and, finding no enforceable civil obligation except where the illegitimate child has been acknowledged, they conclude that the statute can be applicable only to acknowledged illegitimate children. In my opinion a criminal statute which by its very terms compels support of all illegitimate children, without making a distinction as to acknowledged or unacknowledged children, is sufficient of itself to effectuate that purpose.

The Legislature has full power to make criminal any act or omission to act which it deems necessary for the public good, provided that by so doing it does not violate the provisions of the state or federal Constitution. If in the statute the word "illegitimate" had been specifically amplified to include unacknowledged children, would this court nevertheless limit the statute to children to whom a civil duty was owed by the parent, and, if so, under what authority? Under such a clear expression of legislative intent, would this court nevertheless go to the Civil Code to construe that intent? If it did so, it would obviously be substituting its own social and economic policy for that of the Legislature.

The majority has placed undue emphasis on the sentence "Solely for the purpose of determining the obligation to support, the court shall admit proof of paternity or maternity, or both". The provision clearly concerns itself with a matter of evidence and not with the definition of the crime. Its function could only be to limit the *purpose* of proof of maternity or paternity.

The majority opinion in this case not only has violated the plain provisions of Article 74 of the Criminal Code but has done violence to Article 18 as well and to the Civil Code also when it declares that appellant's failure to support was justified under Paragraph (3) of Article 18 because his conduct was "authorized by law". The civil law has not *authorized* the parent of an unacknowledged illegitimate child not to support it. I submit that no law of any civilized community has yet stooped to such a low estate. Article 180 of the Civil Code defines illegitimate children as those born out of marriage. By Article 239 it is recognized that, although illegitimate children, generally speaking, belong to no family, "Nevertheless *nature* and *humanity* establish certain reciprocal duties between fathers and mothers and their illegitimate children", and by Article 240, "Fathers and

mothers owe alimony to their *illegitimate* children, when they are in need * * *". By Article 242 the illegitimate children are denied the right to sue for this alimony unless they have been acknowledged. These provisions deny an illegitimate child who is not acknowledged the right to sue for the alimony that he is owed, but by no means can they be construed as *authorizing* the father of an unacknowledged child *not* to support it so that he would be justified in his criminal act of failure to support. The reasoning of the majority is extremely dangerous because it is tantamount to saying that, if one accused of a crime can show that his act is not also contrary to the civil law and that no civil remedy exists for his act, it is justified because legal under the civil law. Our redactors could never have intended such a meaning by the words "authorized by law".

Moreover, Article 18 of the Criminal Code could not possibly be considered in harmony with the decision in the Jones case, supra, but on the contrary is inconsistent with it. This court in the Jones case decided that the act charged was *not criminal*. If Article 18 dealing with justification has any application, the *act must be criminal* because by a plea of justification a defendant admits a criminal act and seeks to avoid punishment for it on the ground that it was justified.

For these reasons I respectfully dissent.